973 A.2d 948 (2009)
408 N.J. Super. 83
Marilyn PISCITELLI, Plaintiff-Appellant,
v.
CLASSIC RESIDENCE BY HYATT, Defendant-Respondent.
Docket No. A-5027-07T2
Superior Court of New Jersey, Appellate Division.
Argued May 6, 2009.
Decided June 26, 2009.
*951 William S. Greenberg, West Orange, argued the cause for appellant (Greenberg Minasian, L.L.C., attorneys; Mr. Greenberg, on the brief).
Steven Siegel, Hackensack, argued the cause for respondent (Sokol, Behot & Fiorenzo, attorneys; Joseph B. Fiorenzo, of counsel and on the brief, Mr. Siegel, on the brief).
Before Judges STERN, LYONS and ESPINOSA.
The opinion of the court was delivered by
LYONS, J.A.D.
This case touches upon two topics which are the subject of much national discourse, illegal aliens and identity theft. Plaintiff, Marilyn Piscitelli, sued defendant, Classic Residence by Hyatt, for compensatory and punitive damages arising out of its hiring of an illegal alien, Rosa Marchena, who obtained employment with defendant as a maid, using plaintiff's social security number and name. The following factual and procedural history is relevant to our consideration of the issues advanced on appeal.

Facts and Procedural History
In 1999, Rosa Marchena (Ms. Marchena), moved to the United States from Peru and purchased plaintiff's social security number from an unidentified person in New York for $800. Ms. Marchena obtained employment as a maid with defendant in Teaneck on July 7, 2001, using plaintiff's social security number and name.
Plaintiff moved to New York on May 3, 2005, having spent the prior six years in Palm Desert, California. She obtained a "job at the Rockleigh Country Club until January 14, 2007, when she filed for unemployment benefits." She was initially denied benefits because the records indicated she was employed by defendant. The earnings statement for 2006 provided to plaintiff showed the wages Ms. Marchena had received for that year from defendant. By this point, Ms. Marchena was earning *952 more than $18,000 per year, and had accumulated a total of $101,000 in earnings under plaintiff's social security number.
Plaintiff contacted defendant's Chicago headquarters and was eventually provided with the names of its personnel in defendant's Teaneck offices who would be knowledgeable about the problem. Speaking with defendant's human resources employees, Robin Granat and Marc Storiale, plaintiff learned that someone working for defendant was using her name and social security number. On January 23, 2007, plaintiff filed a report with the police department in Suffern, New York, that was eventually referred to the Teaneck Police Department.
On January 25, 2007, two detectives from the Teaneck Police Department went to defendant's facility in Teaneck and met with Mr. Storiale, who introduced them to Ms. Marchena, who was subsequently arrested. On September 5, 2007, Ms. Marchena pled guilty to forgery and identity theft in Teaneck Municipal Court. Sometime thereafter, Ms. Marchena was deported back to Peru.
On October 9, 2007, plaintiff filed a pro se complaint against defendant in Superior Court, seeking damages against defendant "in the amount of $950,000." Throughout the proceedings before the trial court, plaintiff was without counsel. Counsel first entered an appearance on behalf of plaintiff on appeal.
Plaintiff's October 9, 2007, complaint set forth the facts concerning the theft of plaintiff's identity, but did not set forth any legal theories entitling her to the damages sought.
On October 30, 2007, defendant's counsel sent a letter to plaintiff informing her of the "frivolous nature" of her complaint, and indicated that if she did not withdraw the complaint, defendant would seek sanctions against her.
On November 16, 2007, defendant filed a notice of motion to dismiss plaintiff's complaint pursuant to Rule 4:6-2(e) for failure to state a claim. Defendant further requested that the trial court issue an order to show cause as to "why sanctions should not be imposed for filing a frivolous complaint in violation of Rule 1:4-8."
On November 26, 2007, plaintiff filed an amended complaint. In this amended complaint, plaintiff set out the facts recited above regarding Ms. Marchena's theft of her identity and use of plaintiff's social security number to gain employment with defendant. Plaintiff claimed that her causes of action against defendant were for "violations of the U.S.C. [sic] Bill of Rights; 4th Amendment, the New Jersey State Constitution; Article I(1) & (7), the Immigration Reform and Control Act of 1986; 8USC 1324a(a)(1)(B)(i), 8USC 1324a(b)(1)(A), and Negligence."
Plaintiff's amended complaint then discussed how social security numbers are issued, stating that one's social security number is "the individual's personal property in perpetuity." Plaintiff also set forth the "duty of care" from tort law, and offered an explanation as to why a "duty of care" arises from federal immigration laws. She stated that:
[Defendant] breached the Federal "standard of care" in violating 8USC 1324a(b)(1)(A). If [Defendant] had verified [plaintiff's social security number] it would have avoided the Proximate Cause of that breach. [Defendant] hired undocumented Rosa Marchena on July 7, 2001 violating 8USC 1324a(1)(B)(i) and were Negligent in their Federal duty and standard of care to [plaintiff] under Tort Law.
Plaintiff also outlined the privacy protections provided by the Fourth Amendment *953 of the United States Constitution. In her amended complaint, plaintiff increased her demand for compensatory and punitive damages against defendant to $3,950,000. Along with the amended complaint, plaintiff sent a letter to defendant indicating she had amended her complaint pursuant to Rule 1:4-8(b)(1).
On December 9, 2007, plaintiff sent a letter to the trial court in opposition to defendant's motion to dismiss under Rule 1:4-8, indicating she had complied with the Rule by filing an amended complaint.
On December 11, 2007, defendant withdrew its motion to dismiss under Rule 1:4-8. On December 17, 2007, however, defendant filed a new motion to dismiss the amended complaint for failure to state a claim, pursuant to Rule 4:6-2(e). On December 21, 2007, plaintiff filed a motion in opposition of defendant's motion to dismiss. On January 4, 2008, plaintiff filed a motion to compel discovery of defendant's personnel records pertaining to Ms. Marchena.
On the same day, the trial court held a hearing on defendant's motion to dismiss. Defendant briefly summarized its reasons as to why plaintiff's complaint failed to state a cause of action and should be dismissed. The trial court then addressed plaintiff, seeking to clarify if she was arguing that defendant "should have gone to utilize the Homeland Security Identification System," when there is "no [employer] requirement to do that."
Plaintiff stated that defendant was liable to her for the hiring of Ms. Marchena "[b]ecause they hired her without checking her references; without checking her Social Security number." During continued questioning by the trial court, plaintiff stated that defendant "should have contacted the Social Security Administration" via a free on-line program to verify social security numbers. She then claimed that she had the right to file a civil suit under the Immigration Reform and Control Act of 1986 (IRCA) based on the instructions on the IRCA employment verification eligibility form, which she quoted:
This information is for employers to verify the eligibility of individuals for employment, or preclude the unlawful hiring and recruiting, or referring for a fee, of aliens who are not authorized to work in the United States. Submission of the information required onin this form is voluntary. However, an individual may not begin employment unless this form is completed, since employers are subject to civil or criminal ... penalties if they do not comply with the Immigration Reform and Control Act of 1986.
Plaintiff withdrew her claims relating to violations of the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey State Constitution.
The trial court granted defendant's application to dismiss plaintiff's case, without prejudice. The trial court attached a rider to its order setting out its reasons for dismissing plaintiff's case. The court stated that "Defendant noted, and this Court agrees, that there was simply no requirement on Defendant to do any more than it did in implementing its hiring procedures as to Ms. Marchena."
The trial court concluded by ruling that:
This Court finds that Plaintiff has not set forth a viable cause of action against Defendant. As Defendant is not a state actor, Plaintiff cannot allege violations against it pursuant to the Fourth Amendment protections against unlawful search and seizure. Indeed Plaintiff withdrew the Counts pertaining to any such violations. Additionally, Plaintiff lacks standing to prosecute claims under *954 8 U.S.C.A. § 1324a, as Plaintiff is not the United States Attorney General.
This Court further finds that Plaintiff cannot maintain a cause of action under the invasion of privacy tort, as Plaintiff concedes that Defendant was duped, thereby negating the requirement of intentional conduct. Finally, as to Plaintiff's negligence claim, this Court is of the opinion that Defendant did not breach its duty of care, as there is no requirement that Defendant was to utilize a Homeland Security identification system in connection with its hiring procedures.
On January 10, 2008, plaintiff filed a motion to vacate the order of dismissal. In her papers, plaintiff included a letter to the trial judge indicating that her claim of negligence could be supported if she were allowed to examine Ms. Marchena's personnel records.
On January 12, 2008, plaintiff supplemented her motion to vacate with a certification indicating that she had filed a complaint against defendant with the Immigration and Customs Service and that she would soon begin therapy sessions to deal with the emotional distress caused by the identity theft.
Plaintiff again supplemented her motion on January 21, 2008, with a certification, which included a copy of an invoice in plaintiff's name forwarded to her from a medical provider of Ms. Marchena. Her certification also indicated that plaintiff had ordered credit reports to "investigate any damages to credit due to Rosa Marchena and [Defendant]."[1]
Plaintiff withdrew her motion to vacate on January 23, 2008. However, plaintiff renewed the motion to vacate on January 29, 2008. In the letter brief accompanying her motion, plaintiff stated that her complaint should be reinstated based upon the doctrine of res ipsa loquitur which provided "prima facie evidence of negligence" on the part of defendant who thus must "prove any facts inconsistent with negligence."
Plaintiff also attached a proposed second amended complaint with the motion, in which she again stated that the doctrine of res ipsa loquitur supported her claim of negligence against defendant. Plaintiff once again increased her demand for judgment, this time to $6,950,000.[2]
On February 2, 2008, plaintiff provided a supplemental certification to her motion to vacate, in which she attached the tax returns Ms. Marchena filed using plaintiff's name and social security number for the years 2003, 2004, and 2005.
On February 21, 2008, defendant's attorney sent a letter to plaintiff demanding she withdraw her motion to vacate the order dismissing her complaint. In the letter, defendant claimed that the continued pursuit of the complaint was frivolous and that res ipsa loquitur did not apply. Defendant further alleged that plaintiff was receiving assistance from a "ghostwriter" in preparing her legal papers.
When plaintiff failed to respond to defendant's February 21 letter, defendant filed a motion for an order to award counsel fees under Rule 1:4-8.
*955 In the rider attached to its order denying plaintiff's relief, the trial court indicated that:
Plaintiff fails to provide any legal basis to support her requested relief, other than to blankly cite the res ipsa loquitur doctrine, in support of her motion. Plaintiff states no case law nor sets forth any argument whatsoever to support the relief sought.
Additionally, Defendant opposes Plaintiff's motion to vacate dismissal for the following reasons. First, Defendant maintains that Plaintiff fails to present exceptional facts warranting relief, pursuant to Rule 4:50-1(f). See Baumann v. Marinaro, 95 N.J. 380, 394[, 471 A.2d 395] (1984). Defendant also argues, and the court agrees, that res ipsa loquitur is not applicable to the instant action, as the doctrine is generally applied in the context of claims for bodily injury or property damage, and not in the context of identity theft. Even if the doctrine were applicable, Plaintiff's claim must fail, as the alleged negligence of the Defendant does not "bespeak" negligence.
On March 8, 2008, plaintiff filed opposition to defendant's motion for sanctions. Plaintiff filed a notice of motion for discovery on March 9, 2008, requesting all copies that defendant had in its personnel files of the Permanent Resident Alien card used by Ms. Marchena in seeking employment with defendant.
On March 10, 2008, plaintiff once again filed a motion to vacate the dismissal of her complaint. In her notice of motion, plaintiff indicated that her complaint cited "Federal statute 8USC 1324a(b)(1)(A) as cause." In a letter brief in support of her motion to vacate, plaintiff again claimed defendant failed to comply with IRCA. Plaintiff attached a new proposed amended complaint, repeating her claims against defendant and again seeking relief in the amount of $6,950,000.
In plaintiff's proposed third amended complaint, she relied on the provisions of 8 U.S.C. § 1324a to create a duty and went on to allege a breach of that duty. The complaint reads in pertinent part as follows:
8 U.S.C. 1324a(b)(A) is a Federal Statute that requires all employers to verify that potential employees are eligible to work by examining specific documents for authenticity and attesting under penalty of perjury and on the Form I-9 that the documents appear to be genuine and that the individual is not an unauthorized alien.
On June 26, 2001, Rosa Marchena filled out an IMI Data Search, Inc. Consent for Release of Information Form for a criminal background check only, at the Human Resource Department at Classic Residence.
IMI cleared "Marilyn Piscitelli" on June 28, 2001, for employment at Classic Residence. Rosa Marchena returned to the HR Department on July 6, 2001, and completed the application process by filling out Form I-9 and Form W-4 (2001).
The document Rosa Marchena used to establish work eligibility and identity as "Marilyn Piscitelli" was a forged Resident Alien Card # A145030410 issued by the INS with a January 2, 2003, expiration date. Kim Dyce, certified on July 6, 2001, on the Form I-9 that she had examined the document and that it appeared to be genuine.
On the January 2, 2003, expiration date, Lynn Irvine reverified "Marilyn Piscitelli's" new Permanent Resident Alien Card #A145030410 and certified on the same Form I-9 as Kim Dyce that the document appeared to be genuine.

*956 The direct result of both Kim Dyce and Lynn Irvine failing to recognize forged Permanent Resident Alien Card # A145030410 was the negligent hiring and continued employment of Rosa Marchena.
On March 28, 2008, the trial court denied plaintiff's motion for discovery and her motion to vacate the dismissal of her complaint. The trial court also denied defendant's motion for sanctions pursuant to Rule 1:4-8. In the rider attached to the orders, the trial court indicated that "the new evidence presented by Plaintiff does not alter this Court's previous judgment and order dismissing the instant lawsuit. As this Court has previously stated, Defendant had no duty to contact the INS with regard to verifying the authenticity of the documents submitted by Rosa Marchena." While the trial court denied defendant's motion for sanctions, it added at the end of the rider that "if Plaintiff continues to file frivolous motions pursuant to R. 1:4-8, sanctions will be imposed accordingly."
Plaintiff, however, filed a third motion to vacate the dismissal on April 4, 2008. Once again, plaintiff cited IRCA as providing her a cause of action against defendant. Plaintiff continued to demand relief in the amount of $6,950,000.
On April 10, 2008, defendant again sent a letter to plaintiff requesting she withdraw her motion to vacate or face a new request for sanctions under Rule 1:4-8. When plaintiff failed to reply, defendant filed a letter brief with the trial court on April 17, 2008, in opposition to plaintiff's latest motion to vacate.
On April 22, 2008, defendant filed a letter brief with the trial court in support of a motion for sanctions against plaintiff under Rule 1:4-8 and for an order to show cause regarding further sanctions if plaintiff failed to identify the person (or persons) providing her with assistance in preparing her legal papers.
On April 27, 2008, plaintiff submitted a supplemental certification in support of her motion to vacate the dismissal of her complaint. Attached to the certification was a copy of a handbook regarding Form I-9 prepared by the Department of Homeland Security for employers.
On May 4, 2008, plaintiff submitted another supplemental certification to her motion to vacate the dismissal of her claim, along with another proposed amended complaint against defendant in which she made slight alterations to two sections dealing with her IRCA claim.
On May 5, 2008, plaintiff filed opposition to defendant's motion for sanctions under Rule 1:4-8. In her letter brief in support of her opposition, plaintiff claimed defendant was negligent in failing to recognize Ms. Marchena's Resident Alien Card as a forgery, again citing to IRCA.
Plaintiff further indicated that:
D. Plaintiff's Action Is To Not Harass But To Effect Change and Accountability.
In the United States today 2,000,000 Americans have been or are currently affected by Identify Theft in the same manner as Plaintiff. According to Debbie Hill of the Taxpayer Advocate Service the Plaintiff has achieved a higher level of success than most in the same predicament. However the true culprits stay at large due to a legal system that protects the interests of large corporations and profit. As long as the Courts, legislature, and corporate attorneys can cover up and protect the money interests for themselves and for the large corporations who run this country the problem of Identity Theft will continue to grow in the United States.

*957 Defendant's lawyers accuse Plaintiff of being a menace and cite Rule 1:4-8(a)(1) that states in part that a paper is "presented for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation." The Prosecution disagrees. Plaintiff has been given a rare opportunity to effect change and corporate accountability. It is unprecedented. The question Plaintiff puts to the Court is, How much money will it take to effect this change? How much money so that it becomes more than a tax write off or a corporate donation. Right now the people in Chicago are wondering what is going on in Hackensack, New Jersey. What will it take to have them running around their desks with their arms waiving in the air and screaming, "Identity theft! Social security numbers!!!" In the Plaintiff's opinion this is not harassment but change for the greater good.
On May 9, 2008, the trial court heard plaintiff's motion to vacate and defendant's motion for sanctions. At the start of the hearing, the trial court confirmed plaintiff had incurred no out-of-pocket losses.
After hearing from plaintiff regarding the forged INS card of Ms. Marchena, the trial court stated that the new evidence did not change its view on its prior ruling, stating "I think they did a reasonable inspection." The court denied plaintiff's motion and imposed a sanction of $500 against her, but waived that sanction barring any further action from plaintiff before the court. The trial court denied defendant's motion for an order on the issue of legal assistance to plaintiff.
The trial court set out its reasons in writing. The trial court noted that the INS card plaintiff presented as new evidence:
reveals that a reasonable inspection of the card would not have resulted in action against Rosa Marchena, as the card seems reasonably valid on its face, and employers are not held to the standard of an expert in identifying false documents. All that is required is a reasonable inspection, and the Court concludes that Defendant's employee's inspection of the document was reasonable.
Plaintiff then filed her notice of appeal on June 20, 2008.

The Pertinent Provisions of IRCA and Its Legislative History
IRCA, Pub.L. No. 99-603, 100 Stat. 3360 (1986), is codified as amended in various sections of Title 8 of the United States Code. The two sections at issue in this case are 8 U.S.C. § 1324a and § 1324b. § 1324a(a)(1) provides that it is unlawful for a person to hire an unauthorized alien or to hire any person for employment without complying with the employment verification provisions set forth in the statute. The statute goes on to set forth the employment verification requirements that are required by an employer before it hires a prospective employee. 8 U.S.C. § 1324a(b). An employee must verify an individual is not an unauthorized alien by examining certain documents and then attesting it has done so. Ibid. One of the documents which can be used for verification is a resident alien card. 8 U.S.C. § 1324a(b)(1)(B)(ii). Employers who fail to comply with their obligations under the statute face civil fines. 8 U.S.C. § 1324a(e)(4) and (5). Employers who engage in a pattern or practice of knowingly employing undocumented aliens are subject to criminal penalties. 8 U.S.C. § 1324a(f). The statute does establish a "good faith compliance" defense for employers with respect to the employment verification requirements of the law. 8 U.S.C. § 1324a(b)(6).
*958 The statute also provides an express preemption provision. The provision reads as follows: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2).
8 U.S.C. § 1324b prohibits discrimination by employers based on national origin or citizenship status. The Attorney General is specifically charged with enforcing compliance with IRCA. 8 U.S.C. § 1324a(e).
The legislative history of IRCA states that "[t]he purposes of the bill are to control illegal immigration to the U.S., make limited changes in the system for legal immigration, and provide a controlled legalization program for certain undocumented aliens who have entered this country prior to 1982." H.R.Rep. No. 99-682(I) (1986), reprinted in 1986 U.S.C.C.A.N. 5649. Congress stated that "[t]he bill establishes penalties for employers who unknowingly hire undocumented aliens, thereby ending the magnet that lures them to this country." Ibid. Congress was seeking to close "the back door" on illegal immigration, through employer sanctions. Id. at 5650. Congress noted that:
[e]mployment is the magnet that attracts aliens here illegally or, in the case of nonimmigrants, leads them to accept employment in violation of their status. Employers will be deterred by the penalties in this legislation from hiring unauthorized aliens and this, in turn, will deter aliens from entering illegally or violating their status in search of employment.
[Ibid.]
The aim of the legislation was clearly to protect the nation's borders. A thorough review of the legislative history does not indicate any reference to or concern with identity theft.
The statutory penalties were "intended to specifically preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment or referral of undocumented aliens." H.R.Rep. No. 99-682(I), supra, reprinted in 1986 U.S.C.C.A.N. at 5662. Congress made it clear, however, that the civil fines and criminal sanctions were not intended to preempt or prevent lawful State or local processes concerning the suspension, revocation, or refusal to reissue a license to any person who has been found to have violated the sanctions provisions in this legislation. Ibid. Moreover, Congress stated that it was not its intent that:
the employer sanctions provisions of the Bill would be used to undermine or diminish in any way labor protections in existing law, or to limit the powers of federal or state labor relations boards, labor standards agencies, or labor arbitrators to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by existing laws.
[Ibid.]
The debates in Congress also demonstrated a concern that its attempt to verify the legal status of potential employees not result in discrimination against such individuals based on their national origin or because they are aliens who are lawfully admitted for permanent residence. Accordingly, Congress enacted 8 U.S.C. § 1324b to prohibit such discrimination.
A review of the legislative history unquestionably establishes that IRCA was enacted to control the flow of illegal immigration by establishing a system which would reduce the ready availability of employment *959 for illegal aliens with the hope that the absence of such employment would stem illegal immigration. The system devised by Congress to stem illegal immigration was meant to not unduly burden employers and to protect those prospective employees who are legal aliens or citizens, but could be mistaken for illegal aliens based on their national origin.
In conjunction with IRCA, the Congress passed Pub.L. No. 104-208, 401, 110 Stat. 3009-655 to 3009-665 (1997), which created a voluntary pilot program for employee eligibility confirmation. This voluntary eligibility confirmation program is now conducted by the Secretary of Homeland Security. Employers may voluntarily elect to participate in the program. The program is meant to assist employers in verifying the employment eligibility of respective employees by quickly confirming the identity and employment eligibility of an individual utilizing federal data. The system, however, remains a voluntary one. Pub.L. No. 104-208, § 402(a), 110 Stat. 3009-356.

Plaintiff's Issues on Appeal
On appeal, plaintiff raises the following points for our consideration:
POINT I
THE TRIAL COURT ERRED WHEN IT DISMISSED THE AMENDED COMPLAINT.
A. Trial court analysis.
B. Facts were presented that stated a claim.
C. Negligence as a cause of action.
D. The Brunson case.
E. Fraud as a cause of action.
F. Third party beneficiary as a cause of action.
POINT II
THE TRIAL COURT ERRED IN REVIEWING THE AMENDED COMPLAINT BY FAILING TO ASSUME ALL FACTS PLED AS TRUE ALONG WITH ALL REASONABLE INFERENCES THEREFROM.
POINT III
THE TRIAL COURT ERRED WHEN IT DETERMINED THAT THE HOMELAND SECURITY LAW OF 2003 WAS APPLICABLE TO THE WITHIN MATTER.
The arguments raised by plaintiff are essentially as follows: plaintiff, a victim of identity theft, may recover compensatory and punitive damages from the employer of the identity thief, based on: (1) the employer's alleged negligence in complying with the federal employment verification requirements set forth in 8 U.S.C. § 1324a(b); (2) the employer's alleged negligence in not utilizing the federal voluntary pilot program established by Pub.L. No. 104-208, 110 Stat. 3009-655 to 3009-665 to obtain confirmation of the identity of the thief; (3) the employer's alleged negligence enabling the identity thief to obtain employment with it; (4) the alleged fraud by the employer against plaintiff; and (5) the alleged breach by the employer of its "contract with the Federal and State tax authorities" to correctly report plaintiff's earnings.

Standard of Review
The procedural posture of this case is awkward. Plaintiff is appealing from a denial of her application pursuant to Rule 4:50-1(f) to set aside the trial court's order dismissing her complaint without prejudice pursuant to Rule 4:6-2(e). Plaintiff's procedural posture presents us with two somewhat differing standards of review. We recognize that:
[e]xcept for motions for relief from default judgments ... a motion for relief from judgment based on any one of the six specified grounds [in Rule 4:50-1] should be granted sparingly and all motions *960 for relief are addressed to the sound discretion of the trial court, whose determination will be left undisturbed unless it results from a clear abuse of discretion.
[Pressler, Current N.J. Court Rules, comment 1 on R. 4:50-1 (2009).]
Relief under Rule 4:50-1(f) depends on the totality of the circumstances. See In re Guardianship of J.N.H., 172 N.J. 440, 476, 799 A.2d 518 (2002). The movant in such cases normally must show that the circumstances are exceptional and that enforcement of the order or judgment would be unjust, oppressive, or inequitable. See Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 404-07, 734 A.2d 738 (1999).
On the other hand, if this matter is reviewed in the context of a Rule 4:6-2(e) motion to dismiss, a trial court should grant the dismissal "in only the rarest of instances." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 772, 563 A.2d 31 (1989). As our Supreme Court had said in NCP Litig. Trust v. KPMG LLP, 187 N.J. 353, 365, 901 A.2d 871 (2006):
A court's review of a complaint is to be "undertaken with a generous and hospitable approach," Printing Mart-Morristown, supra, 116 N.J. at 746, 563 A.2d 31, and the court should assume that the nonmovant's allegations are true and give that party the benefit of all reasonable inferences, Smith v. SBC Communications, Inc., 178 N.J. 265, 282, 839 A.2d 850 (2004). If "the fundament of a cause of action may be gleaned even from an obscure statement of claim," then the complaint should survive this preliminary stage. Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 626, 660 A.2d 505 (1995) (citation omitted).
In light of our disposition, we view it in the form most advantageous to plaintiff and consider the issues raised on appeal in the context of a dismissal pursuant to Rule 4:6-2(e).

Private Right of Action Pursuant to 8 U.S.C. § 1324a
After a perusal of plaintiff's amended and proposed amended complaints, we find that the gravamen of plaintiff's legal action is her assertion that 8 U.S.C. § 1324a(b) sets forth a statutory standard of conduct which was violated by defendant and which entitles plaintiff to compensatory and punitive damages. In essence, plaintiff alleges that the statute provides her with a private right of action, which would allow her to recover compensatory and punitive damages. We have recently set forth the factors to be considered in determining whether a statute confers upon a private litigant a right of action. In Warren Cty. Bar Assoc. v. Bd. of Freeholders, 386 N.J.Super. 194, 200, 899 A.2d 1028 (App. Div.), certif. denied, 188 N.J. 354, 907 A.2d 1014 (2006), we stated:
In determining whether a statute confers upon private litigants a right of action, we consider: (1) whether plaintiff is a member of the class for whose special benefit the statute was enacted; (2) if there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) whether recognition of an implied right of action would be consistent with the purposes of the legislation. R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 168 N.J. 255, 272, 773 A.2d 1132 (2001).
This analytic framework was established by the Supreme Court in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for determining whether federal statutes permit a private cause of action. The test was adopted by our Supreme *961 Court in Matter of State Comm'n of Investigation, 108 N.J. 35, 41, 527 A.2d 851 (1987). In applying this test, we may give "varying weight" to each of the factors but ultimately the result turns upon the Legislature's intent in enacting a particular statute. R.J. Gaydos, supra, 168 N.J. at 272-73, 773 A.2d 1132 (citing Jalowiecki v. Leuc, 182 N.J.Super. 22, 30, 440 A.2d 21 (App.Div.1981)).
In addition, we note that for the purposes of our analysis if we were to concede that a defendant violated a federal statute at issue, that does not automatically give rise to a private cause of action in favor of a private person. Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82, 91 (1979); Cmty. Hosp. Group, Inc. v. Blume Goldfaden, 381 N.J.Super. 119, 126, 885 A.2d 18 (App.Div.2005).
A review of IRCA, and in particular, 8 U.S.C. § 1324a(e), makes it clear that the United States Attorney General is vested with the authority to file civil and criminal complaints pertaining to violations of the Act. There is, therefore, no explicit private right of action established by 8 U.S.C. § 1324a. The question then becomes whether there is an implied private right of action.
A review of the statute, as well as the legislative history, makes it clear that plaintiff is not a member of the class for whose special benefit the statute was enacted. There is no evidence that the Congress was in any way addressing the issue of identity theft in 1986 when it passed IRCA. Nor is there any evidence to suggest Congress intended to create a private right of action under the statute. To the contrary, the legislative history makes it apparent that Congress was concerned with stemming the flow of illegal immigration and was enlisting employers to do so. Further, it is evident that Congress was mindful of the burden it was imposing on employers and, therefore, incorporated a good faith defense, as well as a preemption provision.
One could argue that the purpose of the legislation, reducing the entry of illegal aliens into the United States by restricting their opportunities for employment here, would be advanced by providing an implied private right of action to aggrieved citizens. However, that would run counter to the delicate balance established by Congress regarding the obligations and responsibilities it was placing on employers on the one hand with the concern that, in the face of such duties, they might discriminate against certain people based on national origin or their citizenship status. This legislation was a long evolving complex and careful solution to a difficult problem. We note, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Alexander v. Sandoval, 532 U.S. 275, 290, 121 S.Ct. 1511, 1521-22, 149 L.Ed.2d 517, 531 (2001); Cmty. Hosp. Group, Inc., supra, 381 N.J.Super. at 126, 885 A.2d 18.
We find, therefore, there is clearly no express private right of action and, after reviewing the appropriate factors, there is no implied private right of action based on a violation of 8 U.S.C. § 1324a(b).

Negligence Based on IRCA and the Voluntary Pilot Program
While plaintiff clearly does not have a private right of action to enforce IRCA and, in particular 8 U.S.C. § 1324a, she seems to argue that the statute, rather than creating a private right of action, creates a standard of conduct against which one may base a cause of action for negligence.[3]
*962 The Restatement (Second) of Torts, § 286 (1965) addresses this issue. It states:
The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part (a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results.
Our courts have adopted the Restatement principle set forth above in Morella v. Machu, 235 N.J.Super. 604, 610, 563 A.2d 881 (App.Div.1989) and United Stations of N.J. v. Kingsley, 99 N.J.Super. 574, 582, 240 A.2d 702 (Ch.Div.1968), aff'd by, Del Spina v. Getty Oil Co., 54 N.J. 150, 253 A.2d 813 (1969). In this case, plaintiff was not in the class of persons who was intended to be protected by IRCA or the Voluntary Pilot Program. The legislative history reveals that Congress was concerned with stemming the flow of illegal aliens. There is nothing in the legislative history that references directly or indirectly protecting individuals from identity theft. That particular interest was not one that was sought to be protected by Congress in this legislation. Further, the legislative history and the language of the statute itself gives no support to plaintiff's argument that IRCA and the pilot program were enacted to protect against identity theft being facilitated by employers.
Accordingly, we do not adopt IRCA and the pilot program as the standard of conduct of a reasonable employer for the purposes of defining the standard of conduct for a tort action because we find that plaintiff is not a member of the class to be protected by IRCA and the pilot program and that identity theft is not the subject matter which Congress sought to address in IRCA and the pilot program. Consistent with the Restatement § 286, we have not, therefore, adopted the statute as the standard for defining negligence in this case. As such, a violation of the statute cannot be deemed negligence "per se." Restatement (Second) of Torts, § 288B(1) (1965). Moreover, "[w]here a statute, ... is found not to provide any standard of conduct applicable to the negligence action, the violation is ordinarily not even considered to be relevant evidence bearing on the question whether the actor has complied with the standard of conduct of a reasonable man." Restatement (Second) of Torts § 288B(2) comment d (1965).

Federal Preemption
Defendant argues that the preemption provision of IRCA preempts any State common law negligence claim plaintiff has arising from the alleged failure of defendant to appropriately verify its potential employee's citizenship or ability to work in the United States. As already noted, 8 U.S.C. § 1324a(h)(2) provides that "[t]he provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."
"The preemption doctrine, rooted in the second clause, article VI of the United States Constitution, requires that when the mandates of federal law and *963 state law are not consistent, the state law must yield." Feldman v. Lederle Labs., 125 N.J. 117, 133, 592 A.2d 1176 (1991). Preemption occurs when Congress explicitly or implicitly states its intent to regulate a specific area to the exclusion of the states. Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 674-75 (1982). Preemption also occurs when a state regulation actually conflicts or is incompatible with federal law. Ibid.
Thus, preemption generally occurs in one of three ways: "(1) where Congress has expressly preempted state law; (2) where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; or (3) where federal law conflicts with state law." Surrick v. Killion, 449 F.3d 520, 531 (3d Cir.2006). In addition,
Federal law preempts not only state laws that expressly prohibit the very act the federal law allows, but those that "stand as an obstacle to the accomplishment of the full purposes and objectives" of federal law. Thus, federal and state law need not be contradictory on their faces for preemption to apply. It is sufficient that the state law "impose[s]... additional conditions" not contemplated by Congress.
[Id. at 532 (citations omitted).]
In this case, plaintiff argues for the creation of a tort sounding in negligence which, in essence, seeks to impose a duty on employers to verify the identity of prospective employees so as to prevent identity theft by a prospective employee. This tort has been denominated by some scholars as "negligent enablement of imposter fraud."[4] It is proposed that this proposed cause of action would be recognized as a state common law cause of action.[5] While it is clear that the federal expression of a statute preempts a similar or conflicting state law, the United States Supreme Court has held that "ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." English v. Gen. Elec. Co., 496 U.S. 72, 89, 110 S.Ct. 2270, 2280, 110 L.Ed.2d 65, 81 (1990) (quoting California v. ARC Am. Corp., 490 U.S. 93, 105, 109 S.Ct. 1661, 1667, 104 L.Ed.2d 86, 97 (1989)).
Plaintiff's alleged tort claim concerns rights and remedies which would be traditionally defined solely by state law. There exists then a presumption against preemption. Feldman, supra, 125 N.J. at 137, 592 A.2d 1176.
A close examination of the IRCA preemption language does not indicate an express preemption concerning a common law cause of action for compensatory damages arising from negligence in hiring an employee. The statute prohibits the imposition *964 of any state or local law imposing civil or criminal sanctions upon those who employ unauthorized aliens. The common law tort sought to be imposed in this case does not impose a civil "sanction" on an employer who employs an unauthorized alien. Rather, it would provide compensatory damages from an employer who failed to verify the correct identity of a prospective employee. This is regardless of whether the individual's prospective employee is or is not an unauthorized alien. To the extent compensation for damages is sought, that is not a sanction.
When reviewing this provision of IRCA, the New York Court of Appeals found that "[a] sanction is generally considered a `penalty or coercive measure' (Black's Law Dictionary 1368 [8th ed.]), such as a punishment for a criminal act or a civil fine for a statutory or regulatory violation." Balbuena v. IDR Realty LLC, 6 N.Y.3d 338, 812 N.Y.S.2d 416, 845 N.E.2d 1246, 1255-56 (2006) (holding New York Scaffold law permits compensation to all workers in qualifying employment situations-regardless of immigration status). The court went on to find that the plain language of 8 U.S.C. § 1324a(h)(2) appears to be directed at laws that impose fines for hiring undocumented aliens. Ibid. Therefore, to the extent plaintiff seeks compensatory damages for the proposed tort of negligent enablement of imposter fraud, the statute does not explicitly preempt that. To the extent plaintiff, however, seeks punitive damages for hiring an illegal alien, that would be an impermissible "sanction" under IRCA, and, therefore, IRCA would expressly preempt such a state common law claim. See Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 50-51, 477 A.2d 1224 (1984).[6]
Therefore, we hold that Congress has not expressly preempted a state common law claim that would provide compensation based on a common law claim of employer negligence for the failure to verify the proper identity of a prospective employee. However, to the extent that that cause of action permits the recovery of punitive damages, it is clear that such a sanction is expressly preempted. Feldman, supra, 125 N.J. at 151, 592 A.2d 1176.[7]
The second prong to determine whether the statute prevents this proposed new form of common law remedy is whether IRCA has so comprehensively addressed the field that it leaves no room for state law. It is well recognized that the power to regulate immigration is unquestionably exclusively a federal power. De Canas v. Bica, 424 U.S. 351, 354, 96 S.Ct. 933, 936, 47 L.Ed.2d 43, 48 (1976). "But, the [United States Supreme] Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." Id. at 355, 96 S.Ct. at 936, 47 L.Ed.2d at 48. In this case, the proposed common law action is not seeking to classify aliens or restrict or affect in any way their ability to work.[8] *965 The proposed tort only touches upon whether a person is or is not who they claim to be. The purpose of the tort is simply to impose liability on an employer who does not verify a prospective employee's identity and it does not deal with their nationality or ability to work in the United States. Moreover, the legislative history of IRCA states it was not intended "to undermine or diminish in any way labor protections in existing laws...." H.R.Rep. No. 99-682(I), supra, reprinted in 1986 U.S.C.C.A.N. at 5662. There is nothing in the record which indicates Congress clearly manifested an intent to preempt the field of compensatory damages for identity theft in the work place. Accordingly, we conclude that "field" preemption does not bar the challenged tort.
Lastly, we must review whether a compensatory award to a victim of identity theft against the employer of an identity thief based upon negligent compliance with IRCA would conflict with IRCA policy, and, therefore, warrant federal preemption.
We note that there is certainly no direct conflict between employers complying with IRCA and the proposed duty sought to be recognized under the espoused tort. There is, however, an implicit tension between the requirements of federal verification and the duties sought to be imposed on employers by plaintiff under common law. The legislative history makes it clear that Congress reluctantly imposed duties on employers in order to stem the flow of illegal aliens. It was concerned with any effect on employment and most importantly on those who may be discriminated against because of their national origin or their current legal status in the country. This is evidenced by IRCA's good faith defense provisions, as well as its provisions against employment discrimination. To impose a new duty on employers, albeit it a state common law one, would upset the delicate balance Congress sought to strike in formulating its remedy to stem the flow of illegal immigration. We hold, therefore, that this sought after remedy, to the extent it relies on violations of IRCA, would be an obstacle to a carefully crafted legislative enactment of Congress requiring employers to verify the authorized status of aliens. Hence, while there is no express conflict, there would be additional conditions placed on employers which were not contemplated by Congress. This cause of action, to the extent it relies on violations of IRCA, would interfere with Congress' plan and, therefore, would be preempted. See Surrick, supra, 449 F.3d at 532; Lozano v. City of Hazleton, 496 F.Supp.2d 477, 528 (M.D.Pa.2007); but see Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 232-33 (2d Cir.2006); Chicanos Por La Causa, Inc. v. Napolitano, 558 F.3d 856, 861 (9th Cir.2008).

Negligent Enablement of Imposter Fraud
Plaintiff argues that she has been injured by the acts of defendant and that normal negligence theories should apply to entitle her to recover her damages, as well as punitive damages. In Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 406, 972 A.2d 1112 (2009), our Supreme Court reaffirmed that in order to state a common law cause of action for negligence, plaintiff must prove: (1) the duty of care; (2) a breach of that duty; (3) proximate cause; and (4) actual damages. The basic question in this case revolves around whether there is a duty on behalf of an employer to verify the identity of prospective employees.[9]
*966 In this case, plaintiff seeks to have each and every employer verify the identity of each prospective employee. A failure to do so would expose that employer to compensatory damages for identity theft to third-parties with whom the employer had no relationship whatsoever.
While legal scholars have argued for the creation of such a tort, two courts, the Supreme Court of South Carolina and the Appellate Division of the Supreme Court of New York, have declined to expand the law to cover such situations. Huggins v. Citibank, N.A., 355 S.C. 329, 585 S.E.2d 275 (2003); Polzer v. TRW, Inc., 256 A.D.2d 248, 682 N.Y.S.2d 194 (N.Y.App. Div.1998). It appears that only the Supreme Court of Alabama, without identifying the tort by name, has found that such a duty exists in the context of a lender and a third party. Patrick v. Union State Bank, supra, 681 So.2d at 1369-70.
We begin our analysis by reviewing our role regarding the recognition of a duty. Our Supreme Court has stated in Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 572-73, 675 A.2d 209 (1996) that:
[t]he question of whether a duty to exercise reasonable care to avoid the risk of harm to another exists is one of fairness and policy that implicates many factors. Dunphy v. Gregor, 136 N.J. 99, 110, 642 A.2d 372 (1994). The determination of such a duty is generally considered "a matter of law properly decided by the court." Wang v. Allstate Ins. Co., 125 N.J. 2, 15, 592 A.2d 527 (1991).
The foreseeability of harm is a significant consideration in the determination of a duty to exercise reasonable care. The "[a]bility to foresee injury to a potential plaintiff does not in itself establish the existence of a duty, but it is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate." Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194, 638 A.2d 1288 (1994) (citations omitted).
"Once the foreseeability of an injured party is established, ... considerations of fairness and policy govern whether the imposition of a duty is warranted." Id. at 194-95, 675 A.2d 209. The assessment of fairness and policy "involves identifying, weighing, and balancing several factorsthe relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (citing Goldberg v. Housing Auth., 38 N.J. 578, 583, 186 A.2d 291 (1962)).
In this case, it is reasonably foreseeable that when an employer does not verify the identity of a prospective employee, the employee may commit identity theft and the identity theft victim, an innocent unrelated third-party, may be hurt. It is, of course, more difficult to foresee harm in those situations where the identity thief steals an unrelated third-party's identity in order to obtain employment, as opposed to those situations where an identity thief attempts to perpetrate a fraud against a financial institution and the victim. However, for the purposes of our discussion, one can concede the foreseeability of injury to a potential plaintiff *967 when a prospective employee's identity is not verified. As our Supreme Court has said, however, the ability to foresee injury does not in itself establish the existence of a duty. Ibid. Other factors must be considered. Id. at 573, 675 A.2d 209. Questions of fairness and policy govern whether the imposition of a duty is warranted. Ibid.
In this case, there was no relationship between the parties. Plaintiff and defendant were not in any way related or had any dealings with each other. In looking at the nature of the attendant risk, it seems that the risk is somewhat lessened in this factual context. Plaintiff suffered no out-of-pocket losses. Her compensatory damages were conceded by counsel to be the interest lost on the late receipt of her unemployment compensation and her time spent to rectify the accuracy of her earnings with the State and Federal government. The identity thief did not create any substantial financial loss to plaintiff. In a situation where one steals another's identity for the purpose of gaining full-time employment and not to misappropriate the victim's assets, the nature of the attendant risk is diminished.
The employer, of course, does have the opportunity to exercise care at the moment of hiring. The ability, however, to do so, so as to root out an imposter at a reasonable expense, may be more problematic. An employer may have to engage in time consuming and expensive efforts to verify an employee's identity. In this case, plaintiff points to the fact that there was a significant age difference between the victim and the thief, but that would have been evident only after a background check at the employer's expense. We also note that the victim may as well have an opportunity to discover identity theft by examining the periodic social security earnings history provided or by taking advantage of periodic free credit checks.
Lastly, we must examine the public interest in the proposed solution. We can take judicial notice of the severe economic downturn and the unemployment situation facing the country. To increase the cost to an employer of hiring may well be contrary to the public interest. Moreover, the Congress, in enacting IRCA, was particularly concerned with potential employment discrimination against those citizens whose national origin is other than the United States and legal aliens. This added responsibility may well upset the balance Congress sought to strike in prohibiting illegal alien employment while not causing employment discrimination due to national origin.
Lastly, to adopt such a new duty would be a sizeable shift in employer liability and could potentially upset traditional concepts and basic principles dealing with protection and remedies in the field of identity theft. New Jersey has addressed identity theft with the enactment of N.J.S.A. 2C:21-17 to -17.6. Among other things, N.J.S.A. 2C:21-17.4 provides a civil remedy for identity theft for the victim. It provides for treble damages, costs, and attorneys' fees. Its relief, though, is directed against the thief. This recently enacted statute evidences the Legislature's choice of remedy. And as stated earlier, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others...." Alexander v. Sandoval, supra, 532 U.S. at 290, 121 S.Ct. at 1521-22, 149 L.E.2d at 531; Cmty. Hosp. Group, Inc., supra, 381 N.J.Super. at 126, 885 A.2d 18.
Moreover, "[a]s an intermediate appellate court, we adhere to existing laws of the State and in the absence of appropriate amendatory legislation any `departure from it should be undertaken by the *968 court of last resort and not by the appellate division.'" Namm v. Charles E. Frosst & Co., 178 N.J.Super. 19, 34, 427 A.2d 1121 (App.Div.1981) (quoting Silagy v. State, 105 N.J.Super. 507, 510, 253 A.2d 478 (App.Div.), certif. denied, 54 N.J. 506, 257 A.2d 106 (1969)). "Extensive policy shifts of this magnitude should not be initiated by an intermediate appellate court." Id. at 35, 427 A.2d 1121. "The appropriate tribunal to accomplish such drastic changes is either the Supreme Court or the Legislature." Ibid.
We recognize that our Supreme Court, recently in Brunson, supra, 199 N.J. at 403-04 n. 13, 972 A.2d 1112, acknowledged that while it did not find a cause of action for negligent investigation of identity theft that "nothing in [its] opinion should be read to foreclose forever a claim that, in appropriate circumstances, a bank may have a duty of care to an innocent, unrelated third party harmed by the theft of his or her identity," but we do not find there to be appropriate circumstances in this case to impose on all employers a duty of care to verify that all prospective employees are who they say they are, so as to protect unrelated third-parties.

Fraud and Third-Party Beneficiary Claims
Plaintiff argues that the trial court should have also inferred a cause of action in civil fraud, as well as a cause of action based on a theory of "third-party beneficiary." We do not agree. First of all, it does not appear that either of these theories were argued to the trial court. "[O]ur appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available...." Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).
That said, the elements of legal fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-73, 876 A.2d 253 (2005). A careful review of not only the pleadings but all reasonable inferences that may arise from them does not demonstrate that defendant made a misrepresentation to plaintiff or that plaintiff relied on any statement whatsoever by defendant. Moreover, Rule 4:5-8(a) requires that fraud be pled in the particulars. We find no showing whatsoever from the pleadings submitted that would lead a court to conclude that defendant has engaged in any fraud toward plaintiff.
Plaintiff also argues that she was a third-party beneficiary of the employer's "contract" with the federal and state tax authorities which were for the benefit of plaintiff. At the outset, we see no contract whatsoever. Employers are obligated by law to provide federal and state tax authorities with various information. There is no contract. Secondly, the employer's legal obligation is not to benefit plaintiff but to assist the federal and state tax authorities in raising revenues. We find plaintiff is certainly not within the class of individuals for whom the federal and state tax requirements on employers were meant to address.[10] Consequently, we also find no merit in plaintiff's third-party beneficiary argument.
In conclusion, we find, after carefully reviewing plaintiff's amended and proposed amended pleadings, and giving her *969 the benefit of all reasonable inferences, that she has failed to state a cause of action, and, hence, we affirm the dismissal of her complaint.
Affirmed.
NOTES
[1] At oral argument on appeal, plaintiff's counsel conceded that plaintiff has not incurred any out-of-pocket damages. Plaintiff's damages are limited to the loss of the use of her unemployment benefits during the period of time she was denied benefits and her time spent in rectifying her credit, Social Security, and IRS records with the appropriate person or agency.
[2] It is in this proposed second amended complaint that plaintiff advised that Rosa Marchena, after having pled guilty to criminal charges, was deported back to Peru.
[3] We note that plaintiff would not find a pure private right of action satisfactory here since she is seeking compensatory and punitive damages and not merely to impose on defendant the civil fines and penalties provided for in the statute.
[4] Scholars have predominantly discussed "negligent enablement of imposter fraud" in the context of a financial institution's duty to protect its customers' information. See Brendan Delaney, Comment: Identity Theft: The Fair Credit Reporting Act and Negligent Enablement of Impostor Fraud, 54 Cath. U.L.Rev. 553 (2005); Heather M. Howard, Notes: The Negligent Enablement of Imposter Fraud: A Common-Sense Common Law Claim, 54 Duke L.J. 1263 (2005); Anthony E. White, Comment: The Recognition of a Negligence Cause of Action For Victims of Identity Theft: Someone Stole My Identity, Now Who is Going To Pay For It?, 88 Marq. L.Rev. 847 (2005).
[5] As will be discussed later in this opinion, South Carolina and New York have both opted not to recognize this cause of action. The Supreme Court of Alabama, however, has recognized the tort in the context of a financial institution's duty to protect third parties from identity theft. Patrick v. Union State Bank, 681 So.2d 1364 (Ala.1996).
[6] While Nappe does not expressly hold that punitive damages equate to sanctions, it does state that punitive damages are "punishment." Nappe, supra, 97 N.J. at 48, 477 A.2d 1224.
[7] We note that mere negligence, no matter how gross, will not suffice as a basis for punitive damages. Smith v. Whitaker, 160 N.J. 221, 242, 734 A.2d 243 (1999).
[8] We recognize, however, that were a duty to verify identity of prospective employees to be imposed, it may adversely impact on the employment opportunities for persons who could be mistaken as unauthorized and we address that in our conflict analysis which follows.
[9] The Supreme Court has long recognized the tort of negligent hiring. Di Cosala v. Kay, 91 N.J. 159, 174, 450 A.2d 508 (1982). However, that tort requires that the employer knew or had reason to know of the particular unfitness, incompetence, or dangerous attributes of the employee and that the employer could reasonably have foreseen that the qualities created a risk of harm to other persons. Id. at 177, 450 A.2d 508. The fact setting for that type of claim generally dealt with dangerous employees and the plaintiffs were generally those who had some form of relationship with the employer, such as customers or the recipient of employee services.
[10] See our earlier discussion regarding § 286 of the Restatement (Second) of Torts.