992 A.2d 4 (2010)
412 N.J. Super. 567
Neal BORDEN and Robert Feldman, Plaintiffs-Respondents,
v.
CADLES OF GRASSY MEADOWS II, LLC, as successor in interest to the Howard Savings Bank, Defendant-Appellant.
DOCKET NO. A-2386-08T1.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 2009.
Decided April 5, 2010.
David K. DeLonge, Jersey City, argued the cause for appellant (Schumann Hanlon, L.L.C., attorneys; Mr. DeLonge, on the brief).
Sam Maybruch, Hazlet, argued the cause for respondents (Maybruch & Zapcic, L.L.C., attorneys; Mr. Maybruch, on the brief).
Before Judges PAYNE, C.L. MINIMAN, and WAUGH.
The opinion of the court was delivered by
MINIMAN, J.A.D.
Defendant Cadles of Grassy Meadows II, L.L.C., the assignee of a judgment in favor of the Howard Savings Bank (the Howard) and its initial assignee, the Federal Deposit Insurance Corporation (FDIC), appeals from a judgment extinguishing and discharging a summary judgment in a foreclosure action under Docket No. F-17852-91 on a commercial mortgage note and guaranties entered in favor of the Howard and the FDIC. Plaintiffs Neal Borden and Robert Feldman were two of the guarantors of the note against whom the summary judgment was entered. The judge in this action vacated the summary judgment because no deficiency hearing was sought by the Howard or the FDIC after a final judgment of foreclosure was entered and the mortgaged property was sold at a sheriff's sale. We reverse and reinstate the summary judgment because the Howard and the FDIC had no duty to trigger a deficiency hearing after the sale of the property and the burden to seek such a hearing rested on the maker of the note and the guarantors under Rule 4:65-5 *5 through a timely objection to the sheriff's sale.

I.
In 1986 Bofel Corporation (Bofel) purchased a seventy-unit apartment building in Hackensack (the property) for conversion to condominiums. Bofel financed the purchase and renovation of the property with funds borrowed from the Howard. Bofel executed a term note for $2 million on December 17, 1986, and a mortgage note for $4 million the same day. Michael Feldman and Neal Borden signed both notes as officers of Bofel. Plaintiffs, together with Michael Feldman and Sidney Feldman, executed a guaranty of payment that day. The guarantors were the individual shareholders of Bofel. To secure the $4 million note, Bofel executed a mortgage on the property in favor of the Howard.[1] On July 17, 1989, Borden wrote to the Howard seeking a loan modification to construct a parking garage on the property as the lack of parking was inhibiting sales. The Howard agreed to modify the loan on July 27, 1989, and the guarantors executed an affirmation of the guaranty on or about January 30, 1990. By 1991, Bofel had sold twenty-two of the units: sixteen in 1988, four in 1989, one in 1990, and one in 1991. This left forty-eight units to be sold.
After Bofel began making only partial payments on the notes, the Howard declared Bofel in default and instituted a foreclosure proceeding against Bofel and the guarantors in December 1991. By then, substantial tax arrearages had accrued. Bofel and the guarantors filed an answer and counterclaim, in which they alleged their ability to sell units had been "significantly and negatively affected by the present economic recession resulting in a severe downturn in the residential real estate market in and about New Jersey, the Northeast, and even nationally." They alleged that the Howard had never advanced the funds for the parking garage. This left the property without adequate parking, which prevented Bofel from selling the units. They claimed that the Howard made representations on which they relied that it would extend the time for repayment knowing that units could not be sold at that time. They contended that the notice of default was in breach of their modification agreement with the Howard. They further alleged that the Howard had breached the loan documents, modification agreement, and various other written and oral agreements extending the loans. They sought equitable and monetary relief.
The Howard sought appointment of a rent receiver in the foreclosure action, relying on the estimate of its chief appraiser that the fair market value (FMV) of the forty-eight unsold units was "likely less" than $3.5 million based on his appraisal of the property. In opposing the application, Borden reported that the condominium association had entered into a management agreement with Michael Brower Realty Co., Inc., to manage the property. He stated that the unsold units had a total gross sale price of $5.1 million, a sum substantially exceeding the Howard's claims. He supported this statement by attaching a copy of an appraisal performed on one condominium unit. He averred the Howard's security was not impaired or in jeopardy. He urged that it was in the interest of all parties to have a sales and rental agent on the premises during normal business hours, a function Bofel was performing. He contended that a rent receiver would have a disastrous effect. He represented that if Bofel were allowed to continue to perform its functions, it *6 would pay $15,000 per month toward the real estate taxes. On April 7, 1992, the Chancery judge appointed Brower to serve as a receiver "to take charge of the mortgaged premises." He was authorized to receive the rents from rented units and to sell or rent vacant units.
On July 17, 1992, the Chancery judge granted summary judgment in favor of the Howard, reducing the debt owed by Bofel and the guarantors on both notes to a judgment in the amount of $3,824,569.32. The summary judgment order also struck the answer, affirmative defenses, and counterclaims of Bofel and the guarantors with prejudice. The matter was "referred to the Office of Foreclosure for disposition as an uncontested foreclosure proceeding," and the judge stayed entry of a final judgment for foreclosure pursuant to Rule 4:64-1 until February 1, 1993. The order also provided:
That any efforts to levy execution on the assets of ... Bofel [and the guarantors] in order to collect the money judgment set forth in paragraph 1, above, are hereby stayed until further order of this Court, which stay shall expire on February 1, 1993. The plaintiff may apply for the issuance of a Writ of Execution for the money judgment granted in paragraph 1, above, but shall not forward such writ to the applicable Sheriff until the expiration of the stay granted herein.
The order also authorized the rent receiver to use funds it collected from sales and rentals to pay past-due real estate taxes either directly or through the bank.
It is not clear at what point in time the Howard went into receivership. However, on January 8, 1993, Brower wrote to E. Robert Fraser, the receiver for the Howard, seeking direction on whether it should keep fourteen units vacant or rent them. He reported that the Howard had agreed to keep the units vacant in order to maximize sale prices.
On September 19, 1994, Jonathan Fischer prepared an appraisal of the forty-eight unsold condominium units for the FDIC. In light of the then-current market conditions, Fischer opined that the units had a total market value of $1.25 million, substantially less than that due on the notes. On October 31, 1994, the FDIC summarized the 1993 financial statements of the four guarantors. That statement indicated the guarantors had negative net assets ranging from minus $4.2 million to minus $30 million. Their gross incomes ranged from nothing to $22,700.
On January 31, 1995, Borden wrote to the FDIC to advise it that Ary Freilich of Blumberg & Freilich Equities was authorized to act on behalf of Bofel and the guarantors "in relation to attempting to work out a settlement agreement between Bofel and the FDIC as regards the subject loan." He stated that Freilich would convey a settlement proposal under separate cover. By then, a sheriff's sale of the property had apparently been scheduled.
On February 2, 1995, Freilich wrote to the FDIC reminding it that Bofel was a single-asset company. He informed it that the guarantors had lost all of their assets "as a result of a series of reversals resulting from the real estate crash." Bofel and the guarantors proposed to settle the loan by making an all-cash payment of $1.7 million and the guarantors would pay an additional $50,000 in exchange for a full release from any and all liability to the FDIC. No settlement was achieved following subsequent negotiations.
On February 6, 1995, Bofel and the guarantors filed a notice of motion to stay the sale of the property, to compel the receiver to account for all revenues and expenses, and for other relief. In support *7 of the motion, Borden certified that the receiver and the FDIC did not comply with the orders of April 7 and July 17, 1992, instructing the receiver to sell or rent the condominium units. He contended that a bulk sale at that time would constitute a waste of the assets. He alleged that while Bofel controlled the property, twenty-two units were sold and all but three of the unsold units were occupied by tenants.
Borden further alleged that the receiver and the FDIC had intentionally withheld units from the market, despite attractive interest rates, and allowed units to become and remain vacant. He alleged a loss of more than $1 million in rental income since the receiver had been appointed, with $15,255.30 being lost monthly. He pointed out that even Brower calculated the lost monthly income at $12,000 and estimated total lost income over the past two years at $360,000.
Borden urged that the actions of the receiver and the FDIC resulted in the vacant units becoming devalued. Specifically, he asserted that the Howard had valued the property at $3.5 million and that two offers to purchase submitted to the FDIC were at $1.8 and $1.9 millionhalf the appraised value at the time the Howard commenced foreclosure. He contended that the units should be sold individually and that the pending sheriff's sale should be stayed.
Borden further pointed out that the twenty-two units sold as of 1991 generated $2.8 million (an average price of $129,000), which was substantially greater than the average sale price proposed by the Howard. He also attached an appraisal dated February 1, 1995, prepared by Karen Balter of Murphy Realty, which valued the units slightly below the Howard's 1992 appraisal, but which would still generate $4 million, if the units were renovated and sold individually, or $3.7 million, if not renovated. Finally, he urged that the rights of the individual guarantors would be greatly affected if a bulk sale took place with the property in its present condition, causing a potential for a huge deficiency judgment.
In opposing the motion to stay the sale, the FDIC argued that Bofel and the guarantors had exhausted their rights to a stay. It asserted that the claims Bofel and the guarantors were now raising should be barred by the doctrine of laches because the actions memorialized in the two letters between the FDIC and the receiver began two years earlier and Bofel knew of those actions at the time because it was copied on both letters. The FDIC urged that it had been severely prejudiced by the delay and the sale should proceed.
The FDIC also argued that the guarantors would not be prejudiced by the sale because N.J.S.A. 2A:50-3, which nominally applies only to residential property, has been applied under equitable principles to commercial property, citing Citibank, N.A. v. Errico, 251 N.J.Super. 236, 597 A.2d 1091 (App.Div.1991). Thus, it contended, the guarantors would be entitled to an FMV hearing when the deficiency was determined and the guarantors' claims could be resolved at that time. The FDIC concluded, "Thus, the [guarantors] will not be prejudiced if the foreclosure sale proceeds as scheduled since they will have the opportunity to present their argument at a deficiency hearingand to receive the benefit of the full [FMV] of the mortgaged premises."
On February 17, 1995, the judge denied the motion to stay the sheriff's sale scheduled for March 1, 1995. There is no indication on the order that the judge stated his reasons for ordering the sale on the *8 record or in a written decision.[2] The judge merely noted on the order, "Motion denied but in any deficiency action defendants will be entitled to [an FMV] credit." The sheriff's sale occurred on March 1, 1995, at which time the sheriff sold the property to Brower for $640,035 subject to the tax arrears. The total judgment at that time, including interest from July 13, 1992, to March 1, 1995, was $4,339,294.74.[3] Bofel and the guarantors apparently did not object to the sale pursuant to Rule 4:65-5 by serving a notice of motion within ten days after the sale contending that the price was below FMV.[4] Thereafter, the FDIC, with no guarantor assets or income, took no further action to collect the roughly $3.6 million deficiency on the judgment nor did plaintiffs take any action to prosecute their claims that the FDIC had impaired the collateral.
In 1996, the FDIC transferred its judgment to JDC Finance III, L.P., a partnership affiliated with the FDIC, which functioned for the purpose of taking FDIC assets for resale to third parties. The judgment was sold to the Value Recovery Group, Inc., on September 7, 1998. After pursuing Michael Feldman until he was discharged in bankruptcy, it sold the judgment in 2001 to The Cadle Company, which in turn assigned it to defendant on March 15, 2007, "but effective as of July 26, 2001." Before making the assignment, The Cadle Company docketed the judgment on March 9, 2007, and defendant obtained a wage execution against Borden thereafter.

II.
Plaintiffs instituted this action on August 21, 2007, to prevent enforcement of the judgment. In their verified complaint, they alleged the history of the foreclosure proceedings. They asserted the FDIC had represented that they were entitled to an FMV credit against any deficiency judgment, but it never commenced a deficiency proceeding within three months after the sale of the property, as required by N.J.S.A. 2A:50-2. As a result, they alleged they never received an FMV hearing. They further argued defendant wrongfully docketed the summary judgment, which was not enforceable under the law. They sought an order discharging and vacating the docketed judgment, compelling defendant to cease all collection proceedings, declaring them free of any and all personal liability, awarding damages for libel upon their credit, and providing other relief. Plaintiffs sought and obtained temporary restraints on execution in an order dated August 24, 2007.
Defendant filed an answer and separate defenses on October 1, 2007, asserting numerous defenses. After discovery supervised by a second Chancery judge, the matter was reached for trial on December 1, 2008. Each party presented testimony regarding the market value of the property. Plaintiffs' expert was Donald J. Helmstetter, a real estate appraiser and consultant, rather than Balter, who had appraised the property for Bofel on February 1, 1995, just one month before the sheriff's sale. Helmstetter testified that if he had been retained in 1995 to appraise the property, he would have gathered information *9 on its day-to-day operations, the condition of improvements, the occupancy of the units, the floor plan layouts, and the extent of renovations. He would then have attempted to determine the worth of the individual units based on sales of other condominium units in the marketplace. This research would have included speaking with tax assessors, reading public records, physically examining other comparable buildings, and speaking with existing tenants. He would have accounted for the amount of time the market needed to absorb the units. After collecting this data, he would project income at a discounted rate for the units for different time periods.
Helmstetter did not conduct such an analysis in this case because so much time had lapsed since 1995. According to Helmstetter, this thirteen-year period had resulted in the loss of information necessary to conduct an appraisal. He testified that the time lapse made it "nearly impossible" to appraise the property in 2008. He admitted he only spent "a few hours" on his analysis and did not gather any information about the property. He was provided with one previous appraisal, that of Fischer. He did not adopt Fischer's appraisal because it was not his own; he found it to be deficient; it did not contain adequate sales data; and it contained unsupported assumptions regarding tenants, operating expenses, and the discount rate.
Fischer testified as an expert for defendant. He detailed how he conducted his appraisal, describing his consideration of vacancies in units, property inspections, comparable buildings, historic sales, and renovations. After discussing various cash-flow and income-capitalization considerations, he testified that, while his opinions were subjective, the forty-eight units had a market value of $1.2 million as of September 19, 1994.

III.
The second Chancery judge placed an oral decision on the record on December 3, 2008. He summarized the foreclosure proceedings reviewed above. He found there were no efforts to collect on the judgment after the sheriff's sale on March 1, 1995, until The Cadle Company docketed the judgment on March 9, 2007. After that, a writ of execution was issued by the clerk to the Bergen County Sheriff. On August 2, 2007, defendant filed and served a notice of wage execution as to Borden, leading to the filing of this action. The judge then found Fischer to be completely credible, although unaware of anything that actually happened with the property. He found that Fischer did "a credible job on the valuation"; the valuation was "a competent and professional appraisal"; and the appraisal was contemporaneous with the sale.
On the other hand, he found that Borden's testimony was "not entirely credible" as to what he did and did not recall. The judge stated he did not base his decision on the credibility of Borden. He also found Helmstetter's testimony "to be somewhat exaggerated" because he made "[n]o effort whatsoever" to investigate the facts. The judge noted that if he "had to decide what was the [FMV] of the property at the time of the sale, the only evidence is that it's approximately what it went for, approximately the value that was indicated by Fischer, in that neighborhood," meaning the sheriff's sale plus the taxes and accrued income.
However, he found that plaintiffs were "disadvantaged and prejudiced by the passage of time from being able to make a competent case as to the [FMV] credit to which [they] ... would have been entitled back in 1995." He found "a kernel of truth" in Helmstetter's testimony "that you cannot now competently challenge or *10 mount a fair market credit argument on behalf of the borrowers ... because of the passage of time."
The judge found that "the borrowers had long maintained that the value of their property had been depleted." He noted they sought to assert those rights by fighting the appointment of the receiver and the sheriff's sale. However, the second Chancery judge found that the first judge was mindful that he had entered a money judgment "[a]nd that if the property was allowed to go to foreclosure sale in the manner contemplated, that they were not going to get the maximum recovery. Therefore, their exposure was going to be unfairly or inequitably increased." The second judge then found that "to protect the borrowers and to not extinguish their claims, [the first judge] did determine that in any deficiency action, [the guarantors] will be entitled to [an FMV] credit." He also found no such action was ever sought or brought by any party.
The second judge then addressed the burden of proceeding with a deficiency action. First, he found that it was "too late in the day to bring a deficiency action ... or even to have a competent deficiency hearing owing to the passage of time," whether the judge applied the time bar of N.J.S.A. 2A:50-3 or under "general principles of laches." He construed the February 17, 1995, order denying the stay to provide:
if there is a pursuit against the individuals for the deficiency between what is achieved at the foreclosure sale versus what is revealed in the judgment, at that time then they can render their opinions and experts and appraisals and arguments as to why they're entitled to this credit.
The second judge found the first judge and the parties understood the equitable right to an FMV credit under Errico, supra, 251 N.J.Super. 236, 597 A.2d 1091. He concluded that "it is the law of this case that [he was] not at liberty to disturb that the borrowers would have an opportunity to make their arguments as to [FMV] credit were they pursued for any perceived deficiency," which was, he felt, "why no judgment was recorded." He found no action was taken because the guarantors had no funds and the judgment creditor determined "not to pursue the deficiency at that time." He found the FDIC did not abandon its judgment and was following the financial status of the borrowers "to see whether it would be worth pursuing or re-initiating or initiating that which was contemplated by [the first judge] in his order" but it and its assignees waited from 1995 to 2007 "to trigger the process." He concluded that was simply too long to initiate the deficiency action.
He noted that laches did not apply to simply waiting to enforce a judgment. However, in this case the deficiency action "was never triggered or initiated by the holder of the judgment ... to bring clarity to the matter at the time when everything was fresh and hot and everybody was represented by counsel." Instead, the FDIC "determined to wait, you know, through two or three presidencies to try to revive these concepts and re-do some archeology and try to re-create the past as best we can." As a result, he granted the relief sought by plaintiffs.
On December 16, 2008, the second judge entered the judgment extinguishing and discharging the 1992 judgment of record. This appeal followed.

IV.
Defendant argues that the judge erred in applying the doctrine of laches to bar enforcement of its judgment. It asserts it had no obligation to docket the judgment *11 or execute levy on nonexistent assets or income. It urges that the February 17, 1995, order merely recognized the right of Bofel and the guarantors to a deficiency hearing, but imposed no obligation on the FDIC and its assignees to file a separate deficiency action where it already had a judgment on the note and guaranty. Defendant asserts that plaintiffs bore the burden of triggering a deficiency hearing and proving the FMV credit because such a credit is a personal defense to be asserted by a mortgagor, citing 30A New Jersey Practice, Law of Mortgages § 39.19 at 611. It argues that competitive bidding at the sheriff's sale and Fischer's appraisal established the proper credit against the judgment. Finally, it contends the allegations against the receiver were irrelevant because a mortgagee who secures the appointment of a receiver is not liable for any alleged acts of negligence by the receiver.
Plaintiffs contend that defendant is ignoring the effect of the delay on them and fails to understand why the judgment was extinguished. They assert they were not required to initiate any deficiency action. Rather, they urge that requiring defendant to initiate a deficiency action is the proper interpretation of the February 17, 1995, order and is consistent with relevant case law. They assert that the competitive bidding at the sheriff's sale and Fischer's appraisal did not establish the proper credit. They also contended defendant had the burden of instituting a deficiency hearing at which they would admittedly have the burden to prove the FMV credit to which they were entitled. Finally, they contend that the judge did not rely on the allegations about the receiver when he decided the case.
Where a judge, as here, has complied with Rule 1:7-4(a) by making findings of fact and stating conclusions of law, although he merely cited to Errico, supra, 251 N.J.Super. 236, 597 A.2d 1091, our appellate review is limited by well-settled, controlling principles. Sebring Assocs. v. Coyle, 347 N.J.Super. 414, 424, 790 A.2d 225 (App.Div.), certif. denied, 172 N.J. 355, 798 A.2d 1269 (2002). "We are not to review the record from the point of view of how we would have decided the matter if we were the court of first instance." Ibid. (citation omitted).
"Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974) (citation omitted). "While we will defer to the trial court's factual findings so long as they are supported by sufficient, credible evidence in the record, our review of the trial court's legal conclusions is de novo." 30 River Court E. Urban Renewal Co. v. Capograsso, 383 N.J.Super. 470, 476, 892 A.2d 711 (App.Div.2006) (citing Rova Farms, supra, 65 N.J. at 483-84, 323 A.2d 495; Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995)).
In the absence of an appeal from the final judgment of foreclosure, the February 17, 1995, order and all other orders entered in the foreclosure proceeding became the law of that case. See Pressler, Current N.J. Court Rules, comment 4 on R. 1:36-3 (2010); see also Monaco v. Hartz Mountain Corp., 178 N.J. 401, 413, 840 A.2d 822 (2004). Determining the meaning and effect of an order entered by a coequal judge involved a question of law, not fact. Thus, our review is plenary and we owe no deference to the second judge's interpretation of the February 17, 1995, order. We construe that order in accordance with the state of the law as it existed on and prior to February 17, 1995.

*12 V.
In 1880 the Legislature enacted "[a]n Act concerning proceedings on bonds and mortgages given for the same indebtedness and the foreclosure and sale of mortgaged premises thereunder." L. 1880, c. 170 (subsequently codified as N.J.S.A. 2A:50-1 to -4). As codified, § 1 provides:
No judgment shall be rendered in any action to foreclose a mortgage for any balance which may be due plaintiff over and above the proceeds of the sale of the mortgaged property, and no execution shall issue therein for the collection of any such balance.
[N.J.S.A. 2A:50-1.]
The 1880 provision governing the order of proceeding, L. 1880, c. 170, § 2, initially provided as follows:
That in all cases where a bond and mortgage has or may hereafter be given for the same debt, it shall be lawful to proceed first to foreclose the mortgage, and if at the sale of the mortgaged premises under said foreclosure proceedings the said premises should not sell for a sum sufficient to satisfy said debt, interest and costs, then and in such case it shall be lawful to proceed on the bond for the deficiency, and that in all suits on said bond, judgment shall be rendered and execution issue only for the balance of debt and costs of suit.
This provision was codified as N.J.S.A. 2A:50-2 and amended by: L. 1881, c. 147, § 1; L. 1932, c. 231, § 1; and L. 1933, c. 82, § 1. In 1979 the provision was amended to expand the scope of the 1880 Act to include actions on notes and mortgages. L. 1979, c. 286, § 1. Those amendments were effective on May 1, 1980, and remain in effect today. Section 2 of the 1880 Act now provides:
Except as otherwise provided, all proceedings to collect any debt secured by a mortgage on real property, shall be as follows:
First, a foreclosure of the mortgage; and
Second, an action on the bond or note for any deficiency, if, at the sale in the foreclosure proceeding, the mortgaged premises do not bring an amount sufficient to satisfy the debt, interest and costs.
The action for any deficiency shall be commenced within 3 months from the date of the sale or, if confirmation is or was required, from the date of the confirmation of the sale of the mortgaged premises. In such action judgment shall be rendered and execution issued only for the balance due on the debt and interest and costs of the action.
No action shall be instituted against any person answerable on the bond or note unless he has been made a party in the action to foreclose the mortgage.
[N.J.S.A. 2A:50-2.]
Section 3 of the 1880 Act, as amended by the 1979 Act, L. 1979, c. 286, § 2, provides for a deficiency hearing:
The obligor in any bond or note specified in section 2A:50-2 of this Title, with respect to any bond given after March 29, 1933, and with respect to any note given after the effective date of this amendatory act [May 1, 1980] may file an answer in the action for deficiency, disputing the amount of the deficiency sued for. In that event both parties may introduce evidence as to the [FMV] of the mortgaged premises at the time of the sale thereof in the foreclosure action, and the court, with or without a jury, shall determine the amount of such deficiency, by deducting from the debt secured the amount determined as the [FMV] of the premises. If all parties to the action shall so agree, the court may accept as the [FMV] of the *13 mortgaged premises the value fixed by three appraisers, to be named by agreement of all the parties to the action, which agreement shall be evidenced by a stipulation to be filed in the action.
[N.J.S.A. 2A:50-3.]
The 1979 amendments, which expanded the scope of the 1880 Act to include notes and mortgages, were in response to two Supreme Court opinions. The first was 79-83 Thirteenth Avenue, Ltd. v. DeMarco, 44 N.J. 525, 210 A.2d 401 (1965), which construed the 1880 Act as amended through 1933. This deficiency action, which followed foreclosure of a first mortgage, was based on a note secured by a mortgage on commercial property. Id. at 528-29, 210 A.2d 401. The Court noted that N.J.S.A. 2A:50-3 applied only to obligors on bonds, not notes. Id. at 529-30, 210 A.2d 401. It observed that the defendants had not objected to the sale in the foreclosure proceeding under Revised Rule 4:83-5, now Rule 4:65-5. Id. at 529, 210 A.2d 401. It reluctantly concluded that the defendants were not entitled to a deficiency hearing because N.J.S.A. 2A:50-3 as it then existed applied only to bonds, not notes. Id. at 529-30, 210 A.2d 401. The Court described the practice as it existed at that time:
In the case of default on a bond and mortgage, the mortgage must be foreclosed first in the Chancery Division. Suit may then be brought on the deficiency in the Law Division. The judgment there recoverable will, since N.J.S.A. 2A:50-3, be limited to the difference between the [FMV] of the property and the debt regardless of the price received for the property at the foreclosure sale, the absence of objection to the sale or the equities of the situation. If the debt is evidenced by a note, the mortgagee has a choice. He may foreclose first if, for example, there are subordinate interests he wishes to cut off, and then sue for the deficiency, the amount of which will be determined solely by the difference between the foreclosure sale price and the debt. Or he may simply sue at law for the full amount due on the note, levy on the mortgaged property in execution of the judgment, and then seek satisfaction out of the defendant's other assets for the difference between the amount realized at the execution sale and the judgment. Under either procedure in the case of a note, he may seemingly himself acquire the property at the judicial sale for a nominal figure (if there are no other bidders), and still collect the full deficiency out of his debtor's other property during the next 20 years.
[Id. at 532-33, 210 A.2d 401 (citations omitted).]
The Court stated the "fundamental principle" that "a mortgagee is not entitled to recover more than the full amount of the mortgage debt." Id. at 534, 210 A.2d 401. That fundamental principle was the foundation for the Lowenstein doctrine that
required a credit, under certain conditions which we need not go into, of the fair value of the property on the amount found due in the foreclosure because collapsed economic conditions [during the Great Depression of the 1930s] had destroyed all market for real estate and made it impossible to secure anything beyond a nominal bid at a judicial sale. The doctrine was founded in the court's inherent power to refuse confirmation of such a sale or prescribe conditions therefor on equitable bases.
[Id. at 534, 210 A.2d 401 (citing Federal Title & Mortgage Guar. Co. v. Lowenstein, 113 N.J. Eq. 200, 208, 166 A. 538 (Ch.1933)).]
The Court then considered "whether analogous nonstatutory relief [was] available *14 ... with respect to a note mortgage deficiency." Ibid. The Court opined:
We agree that a note mortgagor today, although prevented from automatic application of the fair value deduction statute with reference to a deficiency, may obtain review and relief, including reduction of the difference between the mortgage debt and the amount realized at the foreclosure sale, on appropriate equitable bases. We further acquiesce in the conclusion that the forum for such relief should be only the foreclosure action by the procedure of objection to the sale. We say this because the evidence can there be promptly presented in a court of equity and especially since the appropriate relief may be the ordering of a resale which could not well be done months or even years later by the law court in the deficiency suit.
[Id. at 535, 210 A.2d 401 (emphasis added).]
The Court found that "the [FMV] deduction statute is indicative of a broad legislative policy that mortgagors should not be personally liable for more than the difference between that figure and the mortgage debt." Ibid. In the procedure for an FMV credit, the Court emphasized that "the party seeking relief will also have to show with precision the [FMV] of the premises in question and thus that the price realized at the sale was entirely inadequate." Id. at 536, 210 A.2d 401.
The second case leading to the 1979 amendments was another commercial case that discussed DeMarco and reviewed two legislative efforts to amend the 1880 Act in response to DeMarco as well as a proposed rule amendment to require foreclosure prior to actions on notes. Schwartz v. Bender Inv., Inc., 58 N.J. 444, 446-48, 279 A.2d 100 (1971). The Court expressed that it "continue[d] to believe, as set forth at length in DeMarco, that the present differentiation as between note-mortgagors and bond-mortgagors is illogical and what is worse, unfair." Id. at 448, 279 A.2d 100. The Court urged legislative action. Ibid.
Although the Legislature in 1979 cured the DeMarco and Schwartz Courts' criticism of the 1880 Act by bringing mortgage notes within the scope of N.J.S.A. 2A:50-1 to -4, it nonetheless carved out four exceptions to the application of the 1880 Act, one of which, as amended in 1981, is applicable here:
This act shall not apply to proceedings to collect a debt evidenced by a note and secured by a mortgage on real property in the following instances:
a. Where the debt secured is for a business or commercial purpose other than a two-family, three-family or four-family residence in which the owner or his immediate family resides....
[N.J.S.A. 2A:50-2.3.]
This new provision left intact the DeMarco holding that Lowenstein FMV credits must be sought under Rule 4:65-5 by a motion objecting to the sale, but it also implicitly expanded the scope of DeMarco to now apply to actions on commercial mortgage bonds. Our Supreme Court has never revisited its decision in DeMarco, which, absent legislative enactment or a change in our rules of procedure, remains binding on trial and appellate courts. Piscitelli v. Classic Residence by Hyatt, 408 N.J.Super. 83, 114, 973 A.2d 948 (App.Div. 2009) (citation omitted).
In Hudson City Savings Bank v. Hampton Gardens, Ltd., 88 N.J. 16, 438 A.2d 323 (1981), the Supreme Court considered the issue of an FMV credit in the context of a foreclosure proceeding. There, the plaintiff mortgagee purchased the property at a sheriff's sale for a nominal sum, even though the value of the property was probably greater than the debt. Id. at 18, 438 *15 A.2d 323. The plaintiff, after the defendant mortgagor's unsuccessful appeal from the judgment of foreclosure, then sought to recover the interest accruing on the debt from the supersedeas bond posted for the appeal. Ibid. The defendant argued it could not do so because the value of the property exceeded the nominal sum the plaintiff paid and, thus, no interest accrued while the appeal was pending. Id. at 19-20, 438 A.2d 323. The trial court allowed the plaintiff to recover the full amount of the supersedeas bond and we affirmed. Id. at 20, 438 A.2d 323.
The Court held,
Consequently, if as a result of the price received from the foreclosure sale to a bona fide third person, the mortgagee receives an amount sufficient to satisfy the indebtedness (principal and interest) due plus the interest accrued subsequent to the foreclosure judgment while the appeal was pending, then the mortgagee should not prevail on a supersedeas bond conditioned on payment of the same interest. If the sale proceeds are insufficient to cover that interest, then the action on the supersedeas bond may be maintained. A partial recovery of the interest from the sale proceeds would permit a proportionately decreased recovery on the bond.
[Id. at 24-25, 438 A.2d 323 (citations omitted).]
Because the defendant claimed that the property purchased for $100 had a value of at least $1.125 million, the Court concluded that "the parties should be permitted to prove [FMV] and net proceeds from the hypothetical sale. The trial court may then determine what loss in interest, if any, the mortgagee suffered." Id. at 25, 438 A.2d 323. Thus, the FMV credit was to be determined in the foreclosure action, albeit after appeal.
In an action on a note executed before the May 1, 1980, effective date of the 1979 amendments, the Chancery Division in Central Penn National Bank v. Stonebridge Ltd., 185 N.J.Super. 289, 448 A.2d 498 (Ch.Div.1982), considered the issue of an FMV credit. The plaintiff was the first mortgagee on multiple premises mortgaged by defendants Stonebridge Limited and Stonebridge Corporation (Stonebridge); defendant Heritage Mortgage Finance Company (Heritage) was the second mortgagee on some of the premises and a first mortgagee on others. Id. at 295-96, 448 A.2d 498.
The application of Stonebridge to compel Heritage to conduct a sale of the premises subject to its second mortgage simultaneously with the plaintiff's sale of all of the premises had earlier been denied. Ibid. The Chancery judge explained that the reason for the application was to afford Stonebridge "with the opportunity for a `fair value hearing' in a later action for a deficiency." Id. at 296, 448 A.2d 498. The application had been denied because the statutory right to such a hearing applied only to notes given after the effective date of the amendments to N.J.S.A. 2A:50-3. Ibid. The judge also held that even if Stonebridge invoked a Lowenstein FMV credit under DeMarco, "no such relief could be given in the case of a second mortgage" because Heritage was "under no obligation to bid at the first mortgagee's foreclosure sale or to foreclose on the property after the first mortgage has foreclosed." Id. at 297, 448 A.2d 498. Thus, the proper party as to whom an FMV credit should have been sought was the first mortgagee; the defendant mortgagors and guarantors could "not set off the [FMV] against the second mortgage of Heritage, where Heritage does not purchase the premises subject to the first mortgage." Id. at 297-98, 448 A.2d 498 (citation omitted).
*16 Because Heritage held a first mortgage on some premises not mortgaged to the plaintiff, it sought to reopen the foreclosure judgment as to those parcels, amend its cross-complaint to include the defendant first-party guarantors, and re-enter the judgment on foreclosure. Id. at 308, 448 A.2d 498. Although Heritage could maintain a separate action on the guaranties, the judge granted its Rule 4:50-1(f) motion because "[t]he primary purpose of our judicial procedure and the governing rules is to facilitate the granting of justice and to bring about an impartial and expeditious determination of the essential merits of the issues between the parties." Id. at 309, 448 A.2d 498 (citation omitted). The judge observed that actions involving notes and mortgages may
involve a three-step procedure: (1) an action in the Chancery Division to foreclose the mortgage; (2) an action at law on the note[;] and (3) an action in Chancery in the foreclosure proceedings for a determination of the [FMV]. The proceedings on the note further require an objection to the foreclosure sale and an application for [an FMV] hearing. If suit on the note has been instituted in the Law Division, a motion must be made in that Division to stay that action pending the [FMV] hearing, R. 4:52-6, or if no action has been instituted, a motion may be made to restrain the mortgagee from instituting an action in the Law Division pending the [FMV] hearing.
[Id. at 310, 448 A.2d 498 (citing DeMarco, supra, 44 N.J. at 532-33, 210 A.2d 401).]
The judge concluded that "[t]hese procedures offend the single controversy doctrine." Id. at 311, 448 A.2d 498. As a result, he permitted Heritage to amend its cross-claims to include the guarantors and to re-enter the judgment of foreclosure. Id. at 312, 448 A.2d 498. He further provided "that ... upon objection to the sale of the mortgage premises, defendants be permitted ... [an FMV] hearing under the equitable deficiency proceedings pursuant to [DeMarco]," and required that the deficiency be entered in those supplemental proceedings in lieu of instituting a separate action in the Law Division. Id. at 312-13, 448 A.2d 498.
We had occasion to consider the issue of an FMV credit in another context entirely. Morsemere Fed. Sav. & Loan Ass'n v. Nicolaou, 206 N.J.Super. 637, 503 A.2d 392 (App.Div.1986). There, Raymond DiPrima sought to intervene with respect to the proceeds of a foreclosure judgment, which the Chancery judge denied. Id. at 640, 503 A.2d 392. The property had been sold at the foreclosure sale to DiPrima for a sum in excess of the first and second mortgages, creating a surplus on deposit with the court. Id. at 641, 503 A.2d 392. DiPrima was also a subsequent judgment creditor of defendant George Nicolaou only. Ibid. We found that DiPrima had a right to apply to share in the surplus funds pursuant to N.J.S.A. 2A:50-37 and the application should have been granted. Id. at 643, 503 A.2d 392. That, however, did not fully resolve the matter to our satisfaction. Ibid.
We concluded that the Nicolaous should be given an opportunity for an FMV hearing even though they had not requested one. Id. at 643-44, 503 A.2d 392. We noted that subsequent lienholders were bound by the foreclosure judgment pursuant to N.J.S.A. 2A:50-30, id. at 644, 503 A.2d 392, and that the Nicolaous had a right to a deficiency hearing under N.J.S.A. 2A:50-3, ibid. We saw no reason why that statute could not be applied under the court's equitable powers to prevent a possible double recovery or windfall in the context of an application under *17 N.J.S.A. 2A:50-37 where the subsequent lienholder was the purchaser at the sheriff's sale. Id. at 644-45, 503 A.2d 392.
We next considered N.J.S.A. 2A:50-2 and -3, in Errico, supra, 251 N.J.Super. 236, 597 A.2d 1091. There, a deficiency proceeding was instituted against the defendant after foreclosure of a mortgage and security agreement on a commercial property. Id. at 239, 597 A.2d 1091. We were required, among other things, to decide whether N.J.S.A. 2A:50-2.3 constituted a public policy of this State that precluded enforcement of a provision in the note calling for application of New York law, which required an FMV credit when calculating any deficiency judgment. Id. at 241, 597 A.2d 1091 (citation omitted).
We observed that the 1979 amendment to the 1880 Act "was intended to eliminate the difference in treatment between bonds and notes secured by real estate mortgages so that a creditor would first have to look to the property in satisfaction of the debt, before personal liability was sought to be enforced on personal guarantees." Id. at 245, 597 A.2d 1091 (citing Stonebridge, supra, 185 N.J.Super. at 304, 448 A.2d 498). We noted that the judge in Stonebridge
did not limit the [FMV] credit to residential property, but, in the case of a corporate debtor, imposed conditions, including a condition that "in the event of a suit for a deficiency, and upon objection to the sale of the mortgaged premises, defendants be permitted ... [an FMV] hearing under the equitable deficiency proceedings pursuant to 79-83 Thirteenth Avenue v. DeMarco, [44 N.J. 525, 210 A.2d 401 (1965)]...."
[Ibid. (quoting Stonebridge, supra, 185 N.J.Super. at 312, 448 A.2d 498).]
We pointed out that the Chancery judge in Stonebridge knew that "the matter before him was for business or commercial purposes and fell within the exception of N.J.S.A. 2A:50-2.3(a) and (b)." Id. at 246, 597 A.2d 1091 (citing Stonebridge, supra, 185 N.J.Super. at 304, 448 A.2d 498). Thus, we concluded that there was no "violation of public policy ... in allowing the parties to contract for the application of New York law. The exceptions in N.J.S.A. 2A:50-2.3 d[id] not create the type of policy statement that precludes private agreements." Ibid.
Then, in dicta, we opined that
[e]ven in the absence of the contractual provision applying New York law, Citibank's argument that there is no entitlement to [an FMV] credit in a deficiency action in New Jersey on a note where business or commercial property is involved is not a correct statement of our law. Although N.J.S.A. 2A:50-2.3 was amended to exempt mortgages secured by notes for business and commercial properties from the fair market credit provision, we find nothing which precludes a court from applying equitable principles to impose [an FMV] credit to prevent a windfall or where circumstances require equitable relief in the interests of justice.
[Id. at 246-47, 597 A.2d 1091 (citing Hampton Gardens, supra, 88 N.J. 16, 438 A.2d 323; DeMarco, supra, 44 N.J. 525, 210 A.2d 401; Nicolaou, supra, 206 N.J.Super. 637, 503 A.2d 392).]
Because an equity court, whether in the Law or Chancery Divisions, had "inherent power to prevent a potential double recovery or windfall to a judgment creditor," we found no error in the determination of the Law Division that the defendant was entitled to an FMV hearing in the deficiency action filed after the foreclosure. Id. at 247-48, 597 A.2d 1091. This was so because "[a] claim that no personal liability exists, e.g., that the [FMV] of the property *18 exceeds the mortgage debt, is a personal defense which is properly asserted in the deficiency action." Id. at 248, 597 A.2d 1091 (citing N.J.S.A. 2A:50-3). We noted that "[t]o assert it in a foreclosure proceeding would be premature." Ibid. (citation omitted).[5] The panel in Errico did not comment on the language in DeMarco requiring an FMV hearing in the foreclosure action.
We again considered N.J.S.A. 2A:50-2.3 in Summit Trust Co. v. Willow Business Park, L.P., 269 N.J.Super. 439, 635 A.2d 992 (App.Div.), certif. denied, 136 N.J. 30, 641 A.2d 1041 (1994). There, the defendants appealed a summary judgment on a note and personal guaranties secured by a mortgage on commercial real estate. Id. at 441, 635 A.2d 992. In their answer, the defendants asserted that the plaintiff should be compelled to foreclose first on the lien and that the guarantors be given an FMV credit. Ibid. The guaranties were "unequivocal, unconditional and expressly recognized the bank's right to proceed on the guaranties in the event of a default without recourse to any other collateral or security." Id. at 443, 635 A.2d 992. The defendants urged that the judge erred in rejecting their claim that the bank should foreclose on the property first "or, alternatively, that they should be permitted to assert [an FMV] credit in the note and guaranty proceeding." Id. at 444, 635 A.2d 992. We rejected those claims. Ibid.
We held that "a continuing, absolute and unconditional guaranty of a note ... may be enforced directly against the guarantor without prior recourse to foreclosure on the collateral or even against the principal debtor." Id. at 444-45, 635 A.2d 992 (citations omitted). We noted that the protections of N.J.S.A. 2A:50-2 and -3 did not apply to a note and mortgage on commercial properties. Id. at 446, 635 A.2d 992. We next addressed the defendants' contention that they were nonetheless entitled to an FMV credit. Id. at 447, 635 A.2d 992. We concluded that the right to an equitable FMV credit was not available in a separate action on the guaranties because "even as to commercial debtors, [it] arise(s) in the context of a foreclosure proceeding and/or a resulting deficiency proceeding in which the creditor looks to the mortgage as the source of security." Ibid. (citations omitted). It was only where the mortgagor looked first to the property to satisfy the debt that the right to an FMV credit was available. Id. at 448, 635 A.2d 992.
To summarize, as of February 17, 1995, with the exception of the dicta in Errico, FMV credits as to commercial notes and mortgages have only been made available in foreclosure proceedings under Rule 4:65-5 and its predecessor rule when the mortgagor objects to the sheriff's sale and claims entitlement to an FMV credit.
We construe the February 17, 1995, order denying a stay in light of the law as it existed at that time. The first judge knew he had earlier ruled on the counterclaims and affirmative defenses on July 17, 1992, all of which he struck with prejudice on a motion for summary judgment which entered judgment on the notes and guaranties. He knew that left only the subsequently arising claims respecting waste of the assets. He had before him Balter's February 1, 1995, appraisal opining on the then-current FMV. He knew he had stayed levy on the judgment for a sum certain pending entry of the final judgment of foreclosure. He knew Bofel and the guarantors had a right under Rule *19 4:65-5 to object to the sale within ten days if the property sold for less than Balter's appraisal. He knew or should have known that Bofel and the guarantors had a right to a deficiency hearing under DeMarco and its progeny. Finally, he knew no separate lawsuit on the note after the sale was possible because all claims respecting the note and guaranties had been determined. Defendant required no further relief from the court save execution and levy on personal assets and income if any was ever discovered.
It is in this context that we must construe the phrase, "Motion denied but in any deficiency action defendants will be entitled to [an FMV] credit." We are satisfied that the second judge read the word "action" too literally. It is clear that plaintiffs had an equitable, although not a statutory, right to a Lowenstein FMV hearing under DeMarco, supra, 44 N.J. at 535, 210 A.2d 401. The judge knew, or should have known, that "the forum for such relief should be only the foreclosure action by the procedure of objection to the sale." Ibid.; see also Hampton Gardens, supra, 88 N.J. at 25, 438 A.2d 323 (requiring an FMV hearing in a foreclosure proceeding in connection with an application to recover a supersedeas bond); Stonebridge, supra, 185 N.J.Super. at 297, 448 A.2d 498 (requiring a DeMarco hearing following reentry of a judgment of foreclosure on a second mortgage). Although the panel in Errico, supra, 251 N.J.Super. at 248, 597 A.2d 1091, observed in dictum that it would not be error to permit a Lowenstein hearing in a subsequent deficiency action, we do not agree with that dictum, nor do we agree that asserting a right to an FMV hearing "in a foreclosure proceeding would be premature," ibid., at least where the guarantors were parties to the proceeding on the notes and mortgages. That is precisely where the DeMarco Court required the hearing. Indeed, the panel in Willow Business Park, supra, 269 N.J.Super. at 447-48, 635 A.2d 992, specifically rejected an FMV credit where the mortgagor looked first to the guarantors in a suit on the guaranty and did not seek to foreclose on the mortgage. But we need not resolve the issue of whether such a credit is available in a separate action against the guarantors, because here the guarantors were made parties to the foreclosure action and their liability under the guaranties was decided.
We are mindful that "mortgagors should not be personally liable for more than the difference between [the FMV] and the mortgage debt," DeMarco, supra, 44 N.J. at 535, 210 A.2d 401, but the DeMarco Court also made it abundantly clear that the mortgagors had the burden of going forward by filing a motion objecting to the sale under what is now Rule 4:65-5, ibid. In fact, Bofel and the guarantors were prepared for such a motion because they secured an appraisal from Balter one month before the sale, and she found a market value well in excess of the funds ultimately generated by the sheriff's sale. Plaintiffs have not explained why they eschewed the relief available under Rule 4:65-5 during the ten days following the sale. The burden was upon them to proceed; the FDIC was not required to take any further action to trigger an FMV hearing. All of its rights had been determined and no assets or income were available against which to execute and levy. It was not the FDIC's burden to seek an FMV hearing.
Plaintiffs had that burden, but did not timely seek an FMV hearing and are now bound by that election. In fact, this case is a good example of why the forum for an FMV credit should only be in the foreclosure proceeding. Plaintiffs' evidence of the FMV has, according to their expert, now been lost because determining property *20 value "months or even years later," DeMarco, supra, 44 N.J. at 535, 210 A.2d 401, cannot be done, as the second Chancery judge clearly recognized.
Even if we were to consider plaintiffs' belated attempt to trigger an FMV hearing as timely, they chose to rely on an expert who testified that he could not determine an FMV. Fischer, on the other hand, was able to testify to such a value based on his 1994 appraisal, and the second Chancery judge found his testimony to be credible and his appraisal to be competent and professional. His opinion on value was effectively unopposed. The amount realized at the sheriff's sale was determinative of the FMV of the property absent proof to the contrary in the foreclosure proceeding, In re Denaro, 383 B.R. 879, 887 (Bankr.D.N.J.2008), and it was error to vacate the judgment.
Reversed and remanded for re-entry of the judgment in favor of defendant.
NOTES
[1] The $2 million loan may also have been secured by another mortgage.
[2] The parties have not filed the transcript of the February 17, 1995, hearing.
[3] An internal FDIC memo indicated that Brower was also holding $75,000 to $90,000 that it would turn over to the FDIC.
[4] The next document in the record on appeal is an October 4, 1995, order discharging the rent receiver. At that time, Brower had $109,377.21 as of August 18, 1995. It was paid $28,053.04 for its services and was to distribute the balance of the monies.
[5] Of course, in this action, suit was brought against the mortgagor and the individual guarantors, including plaintiffs herein. Thus, unlike the defendant in Errico, plaintiffs' personal FMV defense had to be, and was, properly asserted in the foreclosure proceeding.